IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 6, 2001 Session

## STATE OF TENNESSEE v. LAQUENTON MONGER

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 98-01601, 98-01602     John P. Colton, Jr., Judge**

---

**No. W2000-00489-CCA-R3-CD  - Filed August 27, 2001**

---

The appellant, LaQuenton Monger, was convicted by a jury in the Shelby County Criminal Court of one count of first degree felony murder by aggravated child abuse and one count of aggravated child abuse. The trial court imposed concurrent sentences of life imprisonment in the Tennessee Department of Correction for the felony murder conviction and twenty years imprisonment in the Department for the aggravated child abuse conviction. On appeal, the appellant challenges the sufficiency of the evidence underlying his conviction of felony murder and further challenges the trial court's failure to instruct the jury on lesser-included offenses of felony murder. Following a thorough review of the record and the parties' briefs, we reverse the appellant's convictions of felony murder and aggravated child abuse and remand the cases to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Reversed and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

Edwin C. Lenow, Memphis, Tennessee, for the appellant, LaQuenton Monger.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jennifer Nichols, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On February 10, 1998, a Shelby County Grand Jury returned indictments charging the appellant with the first degree felony murder by aggravated child abuse of his seven-month-old daughter, Quennisha Monger, between the dates of September 15, 1997, and September 17, 1997, and the aggravated child abuse of Quennisha during the same time frame. The appellant's case proceeded to trial on November 2, 1999, concluding on November 5. At trial, the State established

that, on the evening of September 16, 1997, Quennisha and her twin brother Quentavious were briefly in the sole care of the appellant. Specifically, the children's mother, Kenisha Simmons, left the Memphis apartment that she shared with the appellant at approximately 9:15 p.m. in order to pick up her cousin, Utopia Sims, from school and to return videos to a Blockbuster store. She was accompanied by the next-door neighbor's daughter, Angela Averitt Hayes. Simmons and Hayes returned home with Sims at approximately 10:00 p.m. Upon their return, Simmons learned that Quennisha had stopped breathing, and the appellant had taken the baby to the next-door apartment in search of assistance. Simmons entered the next-door apartment along with Hayes and Sims and discovered Quennisha lying on the floor and the appellant speaking on the telephone with a 911 operator. Neither the police nor an ambulance had yet arrived.

Hayes recalled at trial that the scene was "chaotic." Simmons immediately began "crying and hollering," and the appellant also appeared "kind of frantic and hysterical." Hayes attempted to console Simmons. Meanwhile, Sims approached Quennisha and noted that the baby "was pale, her mouth like turned white." She then went to Simmons and the appellant's apartment and retrieved Quentavious from the twins' crib. Sims testified at trial that the baby boy appeared to be unharmed.

The State further established that, sometime between 9:40 p.m. and 10:00 p.m. on September 16, 1997, the appellant's next-door neighbor, Gloria McKissack Wilson, was awakened by someone knocking "rather hard" on her front door. When she opened her front door, she discovered the appellant outside, carrying his infant daughter in his arms. The appellant requested her assistance, stating that his daughter did not appear to be breathing. Upon confirming that Quennisha was not breathing and attempting unsuccessfully to locate the baby's pulse, Wilson advised the appellant to call 911.

There ensued a series of efforts to resuscitate Quennisha. First, the 911 operator guided the appellant in performing mouth-to-mouth resuscitation upon his daughter. The operator was soon informed that the baby was responding to the appellant's efforts in that she appeared to be breathing once again and also had a pulse. Almost immediately thereafter, "a little bit before" 10:25 p.m., officers of the Memphis Police Department arrived. Officer James Sewell testified at the appellant's trial that, at this time, Quennisha was not breathing, nor did she have a pulse. The officers unavailingly administered cardiopulmonary resuscitation (CPR) to Quennisha. Finally, at approximately 10:31 p.m., paramedics employed by the Memphis Fire Department, including Gary Garmon, arrived and continued the administration of CPR to Quennisha. Garmon confirmed at the appellant's trial that, at the time of the paramedics' arrival, Quennisha was not breathing, and her heart was not beating. However, he noted that Quennisha's skin, although cool, was not yet cold; her "color" was normal; and her pupils were not yet dilated. Moreover, upon performing an electrocardiogram (EKG) on the baby, the paramedics discovered "electrical activity to the heart." Nevertheless, they too were unable to revive Quennisha, and she was ultimately pronounced dead at a local hospital.

Wilson testified at the appellant's trial that she observed the appellant's efforts to revive Quennisha. According to Wilson, the appellant appeared to follow the instructions of the 911 operator. Moreover, she asserted that, although she observed the appellant compress Quennisha's chest, she never observed the appellant use more than two fingers, and the appellant pushed on Quennisha's chest "pretty light[ly]." Wilson further observed, and it was undisputed at trial, that the police officers and the paramedics likewise used two fingers when compressing Quennisha's chest. Wilson concluded that she never observed anyone push on Quennisha's chest "with two hands the way you might do on an adult" or otherwise "pound" on the baby's chest.

On the night of Quennisha's death, the appellant reported to Officer Jason Randolph of the Memphis Police Department that there was "a gas leak in [his] apartment and he thought that that was the reason the baby stopped breathing." Moreover, an unidentified woman standing outside Wilson's apartment on the night in question reported to Officer Sewell that "apparently [there was a] gas leak in the apartment [in which] the baby lived." Finally, an unidentified woman standing outside Wilson's apartment informed Richard Waddell, a lieutenant with the Memphis Fire Department, of a possible gas leak in the adjacent apartment. Waddell followed the woman next door and investigated. He recounted at the appellant's trial:

> I went around like the appliances in the kitchen and things like that
> to try to - - where you would check and maybe have gas leaks or any
> kind of leaks like that in the apartments like the kitchen area, I
> checked that out and I couldn't detect anything.

Simmons testified at trial that Quennisha and Quentavious were in the care of their grandmother during the day on September 16, 1997. She recalled that, when she collected the babies that evening, they both appeared to be in normal health. Moreover, she related that, during the ensuing evening, only the appellant had sole care of the babies for any length of time. She conceded that the appellant regularly cared for the children at night and on weekends while she was at school or working, and she had never previously noticed any injuries on either baby. However, she noted that Quennisha had been exhibiting various unexplained physical and behavioral symptoms. For example, Simmons recounted that, from the age of four months until her death, Quennisha

> wouldn't stand up like a normal little seven month will stand on their
> knee - - on their feet and try to push up. She didn't do none of that,
> she always bend down and start crying like something was hurting
> her.

Simmons also recalled that Quennisha "couldn't keep no milk down, they changed her milk several times and she still couldn't keep it down." Finally, Simmons remembered one occasion prior to her daughter's death when Quennisha "gagged" or briefly stopped breathing before resuming normal respiration. Utopia Sims added at trial that, in the past, Quennisha had occasionally appeared to be gasping for breath. On August 5, 1997, approximately one month prior to Quennisha's death, Simmons took her daughter to a Dr. Pisit for an examination but was informed that the baby was healthy.

On the day following Quennisha's death, Wendy Gunther, a forensic pathologist and an assistant medical examiner for Shelby County, performed an autopsy on Quennisha's body. In performing the autopsy, Dr. Gunther first examined the exterior of Quennisha's body. While she observed no "obvious wounds on the baby's body," she did observe approximately one dozen bruises, each measuring approximately one quarter of an inch, on the baby's chest and abdomen. The bruises extended from "a little above the nipple line towards the bottom of the ribs." At trial, she noted:

> If I held the child with my hands, thumbs on her spine and my hands
> in front my fingers roughly matched up to these bruises. I'd have to
> shift my hands a couple of times to match all of them.

She opined that the bruises occurred prior to Quennisha's "death," i.e., prior to the baby's loss of blood pressure.

Dr. Gunther next conducted an internal examination of the baby's body. Upon incising both Quennisha's chest and her abdomen, the doctor was "met by a gush of blood." In all, two fifths of the blood in Quennisha's body had pooled in her chest and abdomen. With respect to the baby's abdomen, the doctor discovered that, in essence, "the whole liver had ruptured through its center." In other words, "the liver had broken in half." Additionally, she observed "in the abdomen . . . blood spots all over the small bowel, tiny blood spots as if little veins had given way." Finally, there was a "big spill of blood" in the mesentery, "the part of the body that connects the blood supply to the guts." Significantly, some of the blood pooled in the mesentery was "old blood," and there was scar tissue surrounding the "old blood crystal stuffed cells." The presence of the "old blood" and the scar tissue indicated that blood had pooled in Quennisha's mesentery on several previous occasions, including at least one occasion days or weeks prior to her death.

With respect to Quennisha's chest, Dr. Gunther discovered a hole in the baby's heart that was larger than the diameter of a pencil. She recounted, "This hole had blood dissecting [or pushing] into the heart tissue around its edges, suggesting that the heart had been under pressure, the pressure had increased, the blood had dissected into the wall of the heart and the wall had given way." The doctor also discovered another hole in a major vein leading to the heart. The vein "had blown open something like the way an inner tube on a bicycle blows open." Finally, Dr. Gunther discovered multiple rib fractures.

At trial, Dr. Gunther described to the jury in detail her findings relating to Quennisha's rib fractures:

> The fractures that I found in the ribs were of at least three different
> ages. The ribs that were primarily injured were ribs 5 through 10.
> You have twelve ribs on each side, and incidentally women and men
> have the same number of ribs. Ribs 1, 2, 3 and 4 which are up top,
> weren't injured at all. Rib 5, which starts right about at your nipple
> or a little above it in the center which is where the top most bruise
> was, is the first rib that I found injury in.

Six, 7, 8 and 9 were the worst injuries. And 10, which is coming close to the edge of the ribs in front was slightly injured. Ribs 5 and 10 were hard to see the fracture because it had healed almost to the point of disappearing, but you could see the angle where the rib was bent abnormally. And if you look very closely you could see the little wrinkle in the rib that showed the healing [site]. So ribs 5 and 10 had fractured and healed weeks ago.

. . . Ribs 6 and 8 on the right and other ribs on the left had fractured much more recently. . . .

They were fractures that would need to be 10 to 14 days old, and could be as much as two or three weeks old. These areas had begun to heal. But they're weaker than normal bone and they will break more easily, and three of them had broken again freshly.

So I had brand new rib fractures through healing re-fractures.

The doctor concluded that Quennisha had suffered a total number of ten or fifteen rib fractures resulting from at least three separate acute injuries that occurred on at least three separate occasions, including "just before death[,] at some period between 10 days and three weeks before death, and at some period four to six weeks before death."

With respect to the "fresh" rib fractures, Dr. Gunther further explained:
The reason I say they didn't occur after death was there was blood around them. A person doesn't bleed around injuries unless they're alive, because when you're dead you no longer have a blood pressure, and without a blood pressure you don't bleed.

She opined that the fresh rib fractures could have occurred within minutes or hours of Quennisha's death. However, she asserted that "[i]t seem[ed] most reasonable and likely" that the rib fractures, the bruises, and the other recent injuries discovered in Quennisha's abdomen and chest "happened as part of one event," in which case "they would have been sustained about the same time as death or a few minutes prior."

Specifically, Dr. Gunther concluded that "the mechanism of death which suggest[s] itself is increasing pressure by the hands," and she described the most likely sequence of events that would result from the application of this "mechanism":
As the pressure begins probably the first thing that happens is the mesentery bleeds. And the second thing is those little veins pop on the surface of the small bowel, because you start with the least and you progress to the worst. And then probably the third thing that happens is that the ribs re-fracture through the old fractures.

-5-

> And then the fourth thing that happens probably is that the liver ruptures. And the fifth thing is that the heart pops, and that hole is bigger than a pencil, opens and the blood pours out and fills the pericardial sack. And this does this until there's so much pressure that the superior vena cava has to rupture to release the pressure.

The doctor noted that the above five stages could occur fairly quickly "with intense sustain[ed] increasing pressure, but it would not be instantaneous. It has to be time for each of those to rupture in turn."

Further addressing the timing of the injuries to Quennisha's liver, heart, and "superior vena cava," Dr. Gunther testified at trial:

> If at the time that the paramedic arrived to perform CPR on Quennisha there was electrical activity in her heart and she was limp but not stiff, and her pupils were not dilated and her fingers were not blue and she had good color then she had been injured only minutes before, at the outside something like ten minutes before because without continuous CPR she was going to die.

Indeed, she noted that, even assuming the administration of CPR, the baby's injuries "could not permit life to be sustained . . . for more than minutes."

That having been said, she remarked that she would be "very surprised" to learn that Quennisha's "color" was normal at the time the baby was examined by the paramedics because two fifths of the blood in her body were pooled in her chest and abdomen. Moreover, Dr. Gunther remarked that, in contrast to Garmon's testimony at trial, his report indicated that, at the time of the paramedics' arrival, the "EKG showed asystole." She explained that "asystole" "means the heart is not attempting to beat at all," i.e., electrical activity of the heart is absent. She conceded that the "EKG strip" that was poorly photocopied onto the back of the report reflected "some sort of heart activity." However, she noted that the time recorded on the EKG strip was inconsistent with the time during which Quennisha was reportedly in the care of the paramedics.

Dr. Gunther rejected the administration of CPR as a possible cause of Quennisha's injuries. Specifically addressing Quennisha's rib fractures, she noted that children possess "extremely elastic bones." More importantly, she observed that Quennisha's rib fractures were not in locations common to injuries resulting from the administration of CPR, even "incorrectly performed CPR." Lastly, addressing all of Quennisha's injuries, she remarked:

> CPR must be performed for a reason. If these injuries were to follow CPR as a result of CPR, which I do not believe they did, then the child had to be almost dying for some other reason. There was no other reason. There was no other injury. . . .
>
> But in addition if CPR had been the cause of these injuries, which I do not believe that it was, it would not explain why there were old injuries.

Dr. Gunther acknowledged that, "[s]ince the new fractures fractured through the old fractures, they would not have required as much pressure." Accordingly, she conceded that,

> [i]f the person grabbing the child in a panic state and rushing to see maybe a neighbor had squeezed the child so hard that they burst her ribs and liver and heart, then this could have happened that way. That would [have] had to have been an extremely hard squeeze, but it could have happened that way - - I was not there.

She reiterated, however, that a sufficient "squeeze" would not only have to be "extremely hard" but would also entail "a sustained pressure." She opined that Quennisha's injuries were "non-accidental."

As to reports of a gas leak possibly associated with Quennisha's death, Dr. Gunther related that testing performed on the baby's blood failed to detect the presence of poisonous gases, including carbon monoxide. However, she conceded her uncertainty that the testing performed on Quennisha's blood was designed to detect Methane, the most common gas associated with leaks. Nevertheless, she asserted that it was unlikely that a baby would die from Methane poisoning. The doctor also conceded that, although she requested testing of the baby's lungs for the presence of natural gas, she never received a report setting forth the results of any such testing. She confirmed that natural gas could cause a baby to stop breathing "if there's so much of it in the room that it pushes out the oxygen."

Finally, the doctor opined at trial that the old fractures in Quennisha's ribs had occurred "by the same mechanism [that caused the new fractures,] which involves squeezing." Indeed, she noted her discovery of "cells holding crystals of old blood in the lungs" as well as the mesentery and posited that the baby had previously been "squeezed until the ribs broke and blood poured into the mesentery and some blood was spilled into the lungs." She noted that squeezing a crying child with sufficient pressure to break the child's ribs could cause the child to "faint[] or pass[] out and, therefore, stop[] crying."

The doctor acknowledged that other explanations for the old rib fractures were possible. For example, she testified that some of the older fractures could have occurred as a result of the baby falling from a car seat onto the floorboard of a car. Nevertheless, she noted that such a scenario was unlikely as "[m]ost children in the literature sustaining falls from much higher than a car seat to a floor do not sustain rib fractures, leg fractures or arm fractures. A rare collar bone fracture is almost the only fracture sustained by a child in a fall from less than six feet."

Dr. Gunther confirmed that the older fractures in Quennisha's ribs might have been the cause of her refusal or inability to stand prior to her death, even when held up by family members. The doctor explained that movement would be painful to a baby with rib fractures. Additionally, if someone attempted to lift a baby with rib fractures, the pain would cause her to respond by crying. Once the baby began crying, her pain would increase, and her legs might appear to be "giving out." The doctor added that the older rib fractures might have caused Quennisha to have "some trouble breathing." Moreover, she confirmed that

the bleeding in the mesentery probably would have made [Quennisha] have a hard time taking food until it began to heal. She might have been vomiting, she likely would have been fussy, she might have been both hungry and then vomiting, which would have made her more difficult to care for and would have made it more likely to provoke punishment of her.

The appellant testified on his own behalf at trial. Preliminarily, he noted that, approximately one month prior to his daughter's death, she was thrown from her car seat onto the floorboard of his car. In essence, the appellant asserted that he was unaware of any other possible cause of his daughter's older injuries. In particular, he denied ever striking his children or otherwise abusing the children. Moreover, he stated that he had never seen Simmons mistreat either baby.

As to the instant offenses, the appellant confirmed that on September 16, 1997, his wife left the apartment at approximately 9:15 p.m. or 9:20 p.m. His son began crying soon thereafter. Accordingly, the appellant changed Quentavious' diaper and gave him a bottle of formula. Afterwards, the appellant checked on his daughter, who was sharing a crib with her twin. The appellant recalled:

> She had a blanket partially over her face, because she has a habit of pulling the blanket over her face, you know, because I get up late at night 2:00, 3:00 o'clock in the morning and she just had a habit of pulling that blanket over her face, so I keep constantly pulling it down. But anyway she - - I called her name a couple of times and she didn't answer me.
>
> And then when I, you know, moved the blanket and picked her up she was limp, you know, like lifeless. And I called her name and kept calling her name, yet and still she wouldn't respond. So I started hitting her in her chest [with my hand] . . . .
>
> . . . .
>
> I hel[d] her nose and I blew into her mouth real hard, and I kept hitting her in her chest, and I know I turned her over and I hit her in her back just in case she probably swallowed something or something. But yet and still she still didn't respond. So when - - I grabbed and ran with her next door.

According to the appellant, he held his daughter "[w]ith his arms out" as he ran next door. When he arrived at Wilson's front door and while he was beating on the door, he placed Quennisha in one arm. When Wilson responded to his knocks, the appellant informed her that Quennisha had stopped breathing. Wilson indicated in turn that she was undressed and instructed the appellant to hold his baby upside down and hit her on her back while Wilson obtained clothing.

-8-

After dressing, Wilson examined Quennisha, attempting to discern whether the child was breathing and to locate a pulse. When her efforts proved unsuccessful, Wilson instructed the appellant to call 911. The appellant confirmed at trial that the 911 operator guided him in performing mouth-to-mouth resuscitation upon his daughter. However, he recalled that the operator failed to explain how to perform chest compressions, and, accordingly, he pressed on his daughter's chest with his entire hand. The appellant conceded that he did not press on Quennisha's chest hard enough "to blow a hole in her heart."

At the conclusion of the trial, the jury found the appellant guilty of first degree felony murder by aggravated child abuse and aggravated child abuse. Because the State sought neither the death penalty nor a sentence of life imprisonment without parole for the offense of felony murder, the trial court sentenced the appellant to life imprisonment in the Tennessee Department of Correction for that offense. The trial court imposed a concurrent sentence of twenty years imprisonment in the Department for the offense of aggravated child abuse.

## II. Analysis

### A. Plain Error

Before resolving the issues raised by the appellant in this appeal, we are compelled to address an error that plainly appears in the record before the court and has affected the substantial rights of the appellant. Tenn. R. Crim. P. 52(b); State v. Smith, 24 S.W.3d 274, 282-283 (Tenn. 2000); see also State v. Kennedy, 7 S.W.3d 58, 70 (Tenn. Crim. App. 1999); State v. Epps, 989 S.W.2d 742, 745-746 (Tenn. Crim. App. 1998). Namely, the appellant's dual convictions of first degree felony murder by aggravated child abuse and aggravated child abuse effect multiple punishments for the same offense thereby violating constitutional prohibitions against double jeopardy.

The Fifth Amendment to the United States Constitution guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." This prohibition against double jeopardy is applicable to the states through the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784, 794, 89 S. Ct. 2056, 2062 (1969); State v. Howard, 30 S.W.3d 271, 277 n.7 (Tenn. 2000). Additionally, Article 1, Section 10 of the Tennessee Constitution provides in almost identical language that "no person shall, for the same offense, be twice put in jeopardy of life or limb." In State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996), our supreme court reiterated the three fundamental principles underlying federal and state constitutional guarantees against double jeopardy: (1) protection against a second prosecution after acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the "same" offense. Again, this case implicates the protection against multiple punishments for the "same" offense.

The court in Denton set forth clear guidelines governing the "resolution of a double jeopardy punishment issue under the Tennessee Constitution." Id. at 379-381. In so doing, the court required an inquiry more extensive than that required by the federal constitution. Id. at 381 n. 15; State v. Winningham, 958 S.W.2d 740, 743 (Tenn. 1997). In summary, in order to determine under

the Tennessee Constitution whether two offenses are the "same" for double jeopardy purposes and therefore preclude multiple punishments, a court must conduct:

> 1. an analysis of the statutory offenses under <u>Blockburger v. United States</u>[, 284 U.S. 299, 52 S. Ct. 180 (1932),] to determine "whether each provision requires proof of an additional fact which the other does not";
> 2. an analysis, guided by the principals of <u>Duchac v. State</u>[, 505 S.W.2d 237 (Tenn. 1973),] of whether the same evidence is required to prove each offense;
> 3. a consideration of whether there were multiple victims or discrete acts; and
> 4. a comparison of the purposes of the respective statutes.

<u>State v. Barney</u>, 986 S.W.2d 545, 549 (Tenn. 1999) (footnotes omitted); <u>see also</u> <u>Denton</u>, 938 S.W.2d at 379-381.

None of the above factors is necessarily determinative, <u>Denton</u>, 938 S.W.2d at 381, but our supreme court has emphasized that "[t]he key issue in multiple punishment cases is legislative intent." <u>Denton</u>, 938 S.W.2d at 379; <u>see also</u> <u>Barney</u>, 986 S.W.2d at 549. Indeed, although passing <u>Blockburger</u> scrutiny is generally required under the federal Double Jeopardy Clause, <u>Winningham</u>, 958 S.W.2d at 743; <u>State v. Hayes</u>, 7 S.W.3d 52, 55 (Tenn. Crim. App. 1999), the United States Supreme Court has stated:

> Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under <u>Blockburger</u>, a court's task of statutory construction is at an end and the prosecution may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

<u>Missouri v. Hunter</u>, 459 U.S. 359, 368-369, 103 S. Ct. 673, 679 (1983). Correspondingly, Tennessee courts have consistently held that, "when legislative intent is clear, a defendant may be separately convicted of two offenses which arise from one criminal transaction." <u>State v. Ralph</u>, 6 S.W.3d 251, 256 (Tenn. 1999).

An example pertinent to the instant case is our supreme court's holding in <u>State v. Blackburn</u>, 694 S.W.2d 934, 937 (Tenn. 1985), that a defendant may be convicted of both felony murder and the underlying felony because "'[n]othing in the statutory definitions of murder in the first degree and of the [underlying] felonies . . . indicates a legislative intent that conviction and punishment for both offenses should not be permitted.'" <u>See also</u> <u>State v. Hall</u>, 976 S.W.2d 121, 171 (Tenn. 1998)(appendix). Of course, at the time of the supreme court's holding in <u>Blackburn</u>, the killing of a child by aggravated child abuse was not included in the first degree murder statute. In contrast to its holding in <u>Blackburn</u>, our supreme court in <u>State v. Ducker</u>, 27 S.W.3d 889, 893 (Tenn. 2000), <u>cert. denied</u>, __ U.S. __, 121 S. Ct. 1202 (2001), explained the intent underlying the legislature's later codification of the reckless killing of a child by aggravated child abuse as first degree murder:

-10-

[A] legislative intent to permit dual convictions and sentences for both felony murder and the predicate felony does not appear to be present under the reckless killing of a child provision in Tenn. Code Ann. § 39-13-202(a)(4) (1994). The legislature originally codified the reckless killing of a child by aggravated child abuse in response to [the public outcry following the conviction of Kerry Phillip Bowers of the lesser offense of second degree murder of Scotty Trexler. See State v. Kerry Phillip Bowers, No. 115, 1989 WL 86576 (Tenn. Crim. App. at Knoxville, August 2, 1989).] This codification was known as the "Scotty Trexler Law." The intent of the Scotty Trexler Law was not to permit dual convictions but to punish the reckless killing of a child as first degree murder.

In a footnote, the court limited its dual conviction analysis to the first degree murder statute in effect in 1994, id. at 893 n.2, noting that the reckless killing of a child by aggravated child abuse was contained in a subsection separate from the general felony murder subsection. More recently, however, in State v. Bobby G. Godsey, No. E1997-00207-CCA-R3-DD, 2000 WL 1337655, at *29 (Tenn. Crim. App. at Knoxville, September 18, 2000), perm. to appeal granted, (Tenn. 2001), this court specifically addressed the 1995 amendment to the first degree murder statute that simply added aggravated child abuse to the general felony murder subsection: "The legislative history of the 1995 amendment to the first degree murder statute suggests that the objective was to increase the degree of the penalty [for aggravated child abuse resulting in the death of the child], not to implement an additional penalty." In other words, the legislative objective of the 1995 Amendment was "to deter the commission of [aggravated child abuse] by holding the perpetrator accountable for any death that might result." Id. at *11. We also noted that, in contrast to the other felonies enumerated in Tenn. Code Ann. § 39-13-202(a)(2) (1997), aggravated child abuse may be a lesser-included offense of homicide. Godsey, No. E1997-00207-CCA-R3-DD, 2000 WL 1337655, at **28-30 (citing Tenn. Code Ann. § 39-15-401(d) (1997)). But see Ducker, 27 S.W.3d at 893 n.1; State v. Cornelius Michael Hyde, No. E2000-00042-CCA-R3-CD, 2000 WL 1877490, at *8 n.1 (Tenn. Crim. App. at Knoxville, December 28, 2000). Accordingly, we concluded in Godsey, No. E1997-00207-CCA-R3-DD, 2000 WL 1337655, at *30, that, "[b]ecause the legislature did not clearly intend a cumulative punishment for aggravated child abuse where there is a conviction and punishment for first degree felony murder arising out of the same aggravated child abuse, the defendant's conviction for the former must be set aside." See also State v. Benjamin Brown, No. W1999-00327-CCA-R3-CD, 2000 WL 1664226, at **7-8 (Tenn. Crim. App. at Jackson, October 24, 2000)(defendant's convictions of both first degree felony murder by aggravated child abuse and aggravated child abuse violated principles of double jeopardy relating to multiple punishments for the same offense).

Keeping in mind both our supreme court's opinion in Ducker and our holding in Godsey, we turn to the application of the guidelines set forth by our supreme court in Denton, 938 S.W.2d at 379-381, to the instant case. Initially, as charged in the indictment in this case, the offense of first degree felony murder by aggravated child abuse comprised the following essential elements:

-11-

(1) the appellant killed Quennisha; (2) the killing was committed in the perpetration of aggravated child abuse; and (3) the appellant intended to commit aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(2) & (b); T.P.I. Crim. No. 7.03(b) (4th ed. 1995). Thus, in order to obtain a conviction of first degree felony murder by aggravated child abuse, the State had to prove the appellant's guilt of aggravated child abuse. In relevant part, Tenn. Code Ann. § 39-15-402(a) (1997) provides that a person commits the offense of aggravated child abuse who knowingly, other than by accidental means, treats a child under eighteen years of age in such a manner as to inflict serious bodily injury. See also Tenn. Code Ann. § 39-15-401(a) (1997). That having been said, in the separate indictment charging the appellant with aggravated child abuse, the State sought to enhance the offense to a class A felony. Accordingly, in order to obtain a conviction of aggravated child abuse, the State was also required to prove beyond a reasonable doubt that Quennisha was six years of age or younger. Tenn. Code Ann. § 39-15-402(b). In short, as required by Blockburger, 284 U.S. at 304, 52 S. Ct. at 182, each offense does require proof of an additional fact which the other does not.

Nevertheless, while the offenses of first degree felony murder by aggravated child abuse and aggravated child abuse pass Blockburger scrutiny, the remaining three prongs of the Denton analysis point to a double jeopardy violation. It is apparent from the State's closing argument that it relied upon the same evidence to prove both offenses. Moreover, the record reflects that there was only one victim, and the pathologist testified at trial that "[i]t seem[ed] most reasonable and likely" that the baby's recent injuries and consequent death "happened as part of one event," i.e., "increasing pressure by the hands." Finally and most importantly, the legislature was addressing the same evil, i.e., the aggravated abuse of a child, in codifying both first degree felony murder by aggravated child abuse and aggravated child abuse. Godsey, No. E1997-00207-CCA-R3-DD, 2000 WL 1337655, at *30.

In sum, we conclude that, under the Denton analysis, "only one offense was committed and only one conviction may stand." Brown, No. W1999-00327-CCA-R3-CD, 2000 WL 1664226, at *8. "Upon a finding that two convictions cannot both stand, the conviction for the greater offense must stand and that for the lower offense must be vacated." State v. Beard, 818 S.W.2d 376, 379 (Tenn. Crim. App. 1991); see also State v. Jeffery Eugene Wright, No. M1999-00647-CCA-R3-CD, 2000 WL 264224, at *4 (Tenn. Crim. App. at Nashville, March 10, 2000). Accordingly, we reverse the appellant's conviction of aggravated child abuse.

## B.    Sufficiency of the Evidence

As to the issues raised by the appellant in this appeal, the appellant first challenges the sufficiency of the evidence underlying his conviction of first degree felony murder by aggravated child abuse. In order to prevail, the appellant must demonstrate to this court that no "rational trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). In other words, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). All factual issues raised by the evidence, including questions concerning the credibility of witnesses and the weight and value to be given the evidence,

are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). These standards apply to convictions based upon direct evidence, circumstantial evidence, or both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000); State v. Vann, 976 S.W.2d 93, 111-112 (Tenn. 1998)(appendix). Thus, as in the case of direct evidence, the weight to be given circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958).

The State's evidence in this case was wholly circumstantial. Accordingly, at trial, the State was required "'to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.'" Hall, 976 S.W.2d at 140 (appendix). Once again, the guilt of the appellant of first degree felony murder by aggravated child abuse required findings by the jury that the appellant killed Quennisha in the perpetration of aggravated child abuse, i.e., while knowingly, other than by accidental means, treating her in such a manner as to inflict serious bodily injury,[1] and that the appellant intended to commit aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(2) & (b); Tenn. Code Ann. § 39-15-402(a); Tenn. Code Ann. § 39-15-401(a).

The appellant argues that the State failed to meet its burden of proof at trial because Dr. Gunther's testimony demonstrated that Quennisha was not in the care of the appellant at the time she received the injuries in her chest and abdomen. Specifically, the appellant cites Dr. Gunther's testimony that, if paramedics examining Quennisha at 10:30 p.m. observed normal skin color and pupils that were not yet dilated and further discovered electrical activity in the baby's heart, Quennisha must have received her injuries "at the outside something like 10 minutes before." As

---

[1] Specifically addressing the requisite nexus in the proof between the causation of death and the perpetration of the underlying felony, our supreme court has recently remarked:

> This Court has previously considered how the statutory phrase, "in the perpetration of," should be defined in the felony murder context. See, e.g., State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999); Farmer v. State, . . . 296 S.W.2d 879 ([Tenn.] 1956). For example, in Farmer, this Court explained that for a killing to occur "in the perpetration of" a felony so that the felony murder rule applies, the killing must be done "in pursuance of the [felony], and not collateral to it. In other words, the killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it . . . ." Farmer, . . . 296 S.W.2d at 883 . . . . In addition, there must be a causal connection between the felony and the killing. Farmer, . . . 296 S.W.2d at 884.
>
> More recently, we recognized that when determining whether a killing is "in the perpetration of" a felony courts in Tennessee have considered such factors as time, place, and causal connection. Buggs, 995 S.W.2d at 106. We stressed in Buggs that a killing "may precede, coincide with, or follow a felony and still be considered as occurring 'in the perpetration of' the felony, so long as there is a connection in time, place, [causation,] and continuity of action."

State v. Pierce, 23 S.W.3d 289, 294 (Tenn. 2000)(alteration in original); see also State v. Patrick Wingate, No. M1999-00624-CCA-R3-CD, 2000 WL 680388, at *7 (Tenn. Crim. App. at Nashville, May 25, 2000), perm. to appeal denied, (Tenn. 2000).

noted earlier, the police were administering CPR to Quennisha during the larger part of the ten minutes preceding the paramedics' arrival. Arguably, Dr. Gunther suggested that the administration of CPR to Quennisha prior to the paramedics' arrival might expand her estimation by minutes. However, for at least twenty-five or thirty minutes prior to the arrival of police, the appellant was attempting to provide care to his daughter in the presence of his neighbor. Moreover, the 911 operator was informed during this time period that Quennisha appeared to be breathing and had a pulse.

Nevertheless, Dr. Gunther's estimation of the time at which Quennisha's injuries were inflicted assumed the accuracy of paramedic Gary Garmon's testimony concerning Quennisha's appearance and the presence of electrical activity in her heart at the time of Garmon's arrival at Wilson's apartment. The jury was entitled to disbelieve Garmon's testimony, particularly in light of Dr. Gunther's remark concerning her surprise that the color of Quennisha's skin was normal at the time of Garmon's arrival, Utopia Sims' testimony that the baby "was pale, her mouth like turned white" one-half hour prior to Garmon's arrival, and the notation in Garmon's report that the "EKG showed asystole." Similarly, in light of Sims' testimony and the chaotic atmosphere in Wilson's apartment immediately prior to the arrival of the police, the jury was entitled to discount the report to the 911 operator that Quennisha briefly revived in response to the appellant's efforts at resuscitation. According deference to the jury's resolution of questions concerning the credibility of witnesses and the weight and value to be given the evidence, the remaining facts and circumstances of this case are "so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant." State v. Crawford, 470 S.W.2d 610, 613 (Tenn. 1971); State v. Adams, 916 S.W.2d 471, 476 (Tenn. Crim. App. 1995).

In summary, we reiterate that, earlier on the evening of her death, Quennisha appeared to be in normal health. Thereafter, only the appellant had sole care of Quennisha and her brother for any length of time. Indeed, the appellant had sole care of Quennisha when he sought Wilson's assistance because the baby had stopped breathing. Dr. Gunther testified that Quennisha's death would have occurred within minutes of the infliction of the injuries in the baby's chest and abdomen. The doctor rejected CPR as the cause of the injuries. Also, while she acknowledged that Quennisha's injuries could have been caused by the appellant grabbing the baby in panic and carrying her to the next-door apartment, the doctor noted that the appellant would have had to exert a sustained pressure sufficient to "burst [Quennisha's] ribs and liver and heart." Moreover, she emphasized that she was unable to detect any reason other than Quennisha's injuries for the baby's respiratory arrest and noted the presence of older injuries. State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997). Accordingly, she opined that the injuries in Quennisha's chest and abdomen were non-accidental. Indeed, the only alternate explanations extractable from the evidence for Quennisha's respiratory arrest were the claims of the appellant and an unidentified woman concerning a phantom gas leak in the appellant's apartment and the claim of the appellant that, on the night in question, Quennisha had pulled her blanket over her face. Assuming, as we must, that the jury declined to accredit these claims, the circumstantial evidence was more than sufficient to support the jury's finding that the appellant killed Quennisha while intentionally committing aggravated child abuse. This issue is without merit.

## C.    Lesser-Included Offenses

Finally, the appellant challenges the trial court's refusal to charge lesser-included offenses of felony murder. We initially note the absence in the record of any request by the appellant that the trial court charge lesser-included offenses of felony murder. Moreover, the record reflects that, at the conclusion of the parties' presentation of proof, the trial court discussed with counsel for both the State and the appellant "whether or not [t]he [trial c]ourt was going to charge down below murder in the perpetration of aggravated child abuse. And [the court] indicated that [it] w[as] not, and that was accepted by both." Nevertheless, a trial court's duty to charge a jury as to the law of each offense included in an indictment exists regardless of any request or objection by the appellant. See, e.g., State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999); Tenn. Code Ann. § 40-18-110(a) (1997). Indeed, the trial court's duty exists regardless of any express agreement by the appellant to the omission from the jury charge of instructions on lesser-included offenses. In this regard, our supreme court has quoted with approval the following observation by the California Supreme Court:

> "A trial court's failure to inform the jury of its option to find the defendant guilty of [a] lesser offense would impair the jury's truth-ascertainment function. Consequently, neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged. To permit this would force the jury to make an 'all or nothing' choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence."

State v. Bolden, 979 S.W.2d 587, 593 (Tenn. 1998)(quoting People v. Barton, 906 P.2d 531, 536 (Cal. 1995)).

Turning to the merits of the appellant's claim, our supreme court recently held in State v. Curtis Jason Ely, Nos. E1998-00099-SC-R11-CD & E1999-00170-SC-R11-CD, 2001 WL 605097 (Tenn. at Knoxville, June 5, 2001)(publication pending), that the offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder. Id. at *9. However, we must still determine whether the evidence in the appellant's case warranted a jury instruction on these lesser-included offenses. In making this determination, a court "must view the evidence liberally in the light most favorable to the existence of the lesser-included offense[s] without making any judgments on the credibility of such evidence." Burns, 6 S.W.3d at 469. If, when viewed in this light, "evidence exists that reasonable minds could accept as to the lesser-included offense[s]" and this evidence is legally sufficient to support convictions of the lesser-included offenses, the evidence will warrant instructions thereon. Id.

Applying the above test to the instant case, we preliminarily note that the distinction between first degree felony murder and its lesser-included offenses lies in the requisite culpable mental states. Ely, Nos. E1998-00099-SC-R11-CD & E1999-00170-SC-R11-CD, 2001 WL 605097, at *9. Whereas the offense of first degree felony murder by aggravated child abuse requires an intent to commit aggravated child abuse, Tenn. Code Ann. § 39-13-202(b), the offense of second degree

-15-

murder requires a knowing killing of another, Tenn. Code Ann. § 39-13-210 (1997). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (1997). Alternatively, reckless homicide requires a reckless killing of another. Tenn. Code Ann. § 39-13-215 (1997). "'Reckless' refers to a person who acts recklessly with respect to . . . the result of [his] conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." Tenn. Code Ann. § 39-11-302(c). Finally, criminally negligent homicide entails criminally negligent conduct that results in death. Tenn. Code Ann. § 39-13-212 (1997). "'Criminal negligence' refers to a person who acts with criminal negligence with respect to the . . . result of [his] conduct when the person ought to be aware of a substantial and unjustifiable risk that the . . . result will occur." Tenn. Code Ann. § 39-11-302(d). In cases of reckless homicide and criminally negligent homicide, the risk "must be of such a nature and degree" that its disregard or the failure to perceive it, respectively, "constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Id. at (c) & (d).

Reviewing once again the evidence adduced at the appellant's trial, we reiterate that the weight to be given circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable, 313 S.W.2d at 457. We have already determined that a rational jury could have found that the circumstantial evidence adduced at trial excluded every reasonable hypothesis save the appellant's intentional commission of aggravated child abuse thereby causing Quennisha's death. However, a rational jury could also have found that, regardless of whether the appellant intended to engage in abusive conduct, "*at least*" he was aware that his conduct was reasonably certain to cause Quennisha's death, or he was aware of but consciously disregarded a substantial and unjustifiable risk that death would occur, or he ought to have been aware of a substantial and unjustifiable risk that death would occur. Ely, Nos. E1998-00099-SC-R11-CD & E1999-00170-SC-R11-CD, 2001 WL 605097, at *12. In short, the absence of any intent to commit aggravated child abuse is not an essential element of second degree murder, reckless homicide, or criminally negligent homicide. Therefore, whether the evidence at trial established the appellant's intent to commit aggravated child abuse is immaterial when determining whether sufficient evidence exists supporting the appellant's guilt of the lesser-included offenses of first degree felony murder. State v. Swindle, 30 S.W.3d 289, 293 (Tenn. 2000); see also, e.g., Burns, 6 S.W.3d at 471-472 (observing that "[w]hether sufficient evidence supports a conviction of the charged offense does not affect the trial court's duty to instruct on the lesser offense if evidence also supports a finding of guilt on the lesser offense"). Accordingly, the trial court's failure in this case to instruct the jury on the lesser-included offenses of first degree felony murder was error. Cf. State v. Mitchell Shephard, No. E2000-00628-CCA-R3-CD, 2001 WL 767010, at *9 (Tenn. Crim. App. at Knoxville, July 3, 2001).

Finally, as in Ely, Nos. E1998-00099-SC-R11-CD & E1999-00170-SC-R11-CD, 2001 WL 605097, at *14,

-16-

the jury in this case was given no option to convict of a lesser offense than felony murder. Although the evidence clearly was sufficient to support a conviction for second degree murder, reckless homicide, or criminally negligent homicide, the jury was not given an opportunity to reach a decision on these offenses. Under these circumstances, we cannot say the failure to instruct on the lesser-included offenses was harmless beyond a reasonable doubt.

### III.  Conclusion

For the foregoing reasons, we reverse the appellant's convictions of first degree felony murder by aggravated child abuse and aggravated child abuse and remand the cases to the trial court for a new trial with the further caution that the trial court keep in mind the double jeopardy concerns addressed in this opinion.

_____
NORMA McGEE OGLE, JUDGE